# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **CONSUMER FINANCIAL** | ) | |
| **PROTECTION BUREAU,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:17-cv-02521-JAR-JPO** |
| | ) | |
| **GOLDEN VALLEY LENDING, INC.,** | ) | **Hon. Julie A. Robinson** |
| *et al.* | ) | |
| | ) | |
| **Defendants.** | ) | |

## BRIEF AS *AMICUS CURIAE* BY
## THE NATIVE AMERICAN FINANCIAL SERVICES ASSOCIATION
## IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

WALLACE SAUNDERS

Nathaniel A. Dulle KS 23295
10111 West 87th Street
Overland Park, KS 66212
Telephone: (913) 888-1000
Facsimile: (913) 888-1065
ndulle@wallacesaunders.com
*Attorneys for* Amicus Curiae *Native
American Financial Services Association*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... ii

STATEMENT OF INTEREST ...................................................................................................1

SUMMARY OF ARGUMENT ...................................................................................................2

REASONS FOR GRANTING THE MOTION TO DISMISS .......................................................4

    I.   The Motion to Dismiss Should Be Granted for the Reasons Stated by Defendants. ............4

    II.  The CFPB's Overreach Threatens Tribes' Legal, Sovereign Economic Development
        Efforts. ..........................................................................................................................4

        a)   The Legal, Sovereign (and Necessary) Authority of Tribal Governments to Engage in
            Commercial Activity as Governmental Economic Development. ................................ 4

        b)   The CFPB's Actions Contravene Federal Law and Policy and Constitute Clear
            Overreach. ............................................................................................................... 8

    III. TLEs Are Helping to Alleviate Tribal Poverty Among Native Americans. .......................10

CONCLUSION ........................................................................................................................12

# TABLE OF AUTHORITIES

## CASES

*Barona Band of Mission Indians v. Yee*,
 528 F.3d 1184 (9th Cir. 2008) ..................................................................................4

*Breakthrough Management Group, Inc. v. Chukchansi Gold Casino & Resort*,
 629 F.3d 1173 (2010)..............................................................................................8

*Bynon v. Mansfield*,
 No. 15-00206, 2016 WL 4089169
 (E.D. Pa. May 21, 2015) ..........................................................................................9

*California v. Cabazon Band of Mission Indians*,
 480 U.S. 202 (1987)................................................................................................7

*Carnival Cruise Lines, Inc. v. Shute*,
 499 U.S. 585 (1991)................................................................................................7

*Cherokee Nation v. Georgia*,
 30 U.S. 1 (5 Pet.) (1831) ..........................................................................................2

*Churchill Financial Management Corp. v. ClearNexus, Inc.*,
 802 S.E.2d 85 (Ga. Ct. App. 2017)...........................................................................9

*Everette v. Mitchem*,
 No. 15-1261, 2016 WL 470840 (D. Md. Feb. 8, 2016)...............................................9

*Finn v. Great Plains Lending*,
 No. 16-415, 2016 WL 6537986 (W.D. Okla. Nov. 3, 2016), *vacated*,
 No. 16-6348, 2017 WL 2376550 (10th Cir. June 1, 2017).................................... 8-9

*Great Plains Lending v. Connecticut Department of Banking*,
 Memorandum of Decision, No. HHB-CV-15-6028096-S (Conn. Super. Ct. Nov. 23, 2015)...9

*In the Matter of: Zero Parallel, LLC*,
 No. 2017-CFPB-0017, Consent Order ¶ 26 (CFPB Sept. 6, 2017),
 http://files.consumerfinance.gov/f/documents/201709_cfpb_zero-parallel-llc_consent-order.pdf ....................................................................................................................9

*Inyo County, California v. Paiute-Shoshone Indians of the Bishop Community*,
 538 U.S. 701 (2003)................................................................................................2

*Marquette National Bank of Minneapolis v. First of Omaha Service Corp.*,
 439 U.S. 299 (1978)................................................................................................7

*Michigan v. Bay Mills Indian Community*,
134 S. Ct. 2024 (2014) ..................................................................................2, 4, 7, 8

*Moe v. Confederated Salish & Kootenai Tribes of the Flathead Reservation*,
425 U.S. 463 (1976) ..........................................................................................4

*NLRB v. Pueblo of San Juan*,
276 F.3d 1186 (10th Cir. 2002) ......................................................................2

*Oklahoma Tax Commission v. Citizen Band Potawatomi Tribe of Oklahoma*,
498 U.S. 505 (1991) ..........................................................................................4

*Puyallup Tribe, Inc. v. Department of Game of the State of Washington*,
433 U.S. 165 (1977) ..........................................................................................4

*Rothe Development, Inc. v. Dep't of Defense*,
836 F.3d 57 (D.C. Cir. 2016), *cert. denied*,
No. 16-1239, 2017 WL 1375832 (U.S. Oct. 16, 17, 2017) ..............................7

*Seminole Nation v. United States*,
316 U.S. 286 (1942) ..........................................................................................9

*United States v. Mitchell*,
463 U.S. 206 (1983) ..........................................................................................9

*Vermont Agency of Natural Resources v. United States ex rel. Stevens*,
529 U.S. 765 (2000) ..........................................................................................2

*Washington v. Confederated Tribes of the Colville Indian Reservation*,
447 U.S. 134 (1980) ..........................................................................................4

*White Mountain Apache Tribe v. Bracker*,
448 U.S. 136 (1980) ..........................................................................................4

*Wyoming v. EPA*,
849 F.3d 861 (10th Cir. 2017) ........................................................................4

## STATUTES

Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010,
Pub. L. No. 111-203, 124 Stat. 1376 ..............................................................8

12 U.S.C. § 5493(c)(2)(B) ....................................................................................8

12 U.S.C. § 5495 ..................................................................................................8

Native American Business Development, Trade Promotion and Tourism Act of 2000
25 U.S.C. § 4302.................................................................................................8

## OTHER AUTHORITIES

Randall K.Q. Akee & Jonathan B. Taylor, *Social and Economic Change on American Indian Reservations: A Databook of the US Censuses and the American Community Survey 1990–2010* (2014),
http://static1.squarespace.com/static/52557b58e4b0d4767401ce95/t/5379756ce4b095f55e75c77b/1400468844624/AkeeTaylorUSDatab ook2014-05-15.pdf [https://perma.cc/P9YK-ZEUE]..................................................................................................5, 6

Donald L. Barlett & James B. Steele,
*Wheel of Misfortune*, TIME, Dec. 16, 2002.............................................................5

Duane Champagne, *Breaking the Cycle of Poverty and Crime in Indian Country*, Indian Country Today (Oct. 6, 2013),
https://indiancountrymedianetwork.com/news/politics/breaking-the-cycle-of-poverty-and-crime-in-indian-country/................................................................................. 6

Gavin Clarkson & James K. Sebenius, *Leveraging Tribal Sovereignty for Economic Opportunity: A Strategic Negotiations Perspective*,
76 Mo. L. Rev. 1045 (2011) ..................................................................................7

Gavin Clarkson, Katherine A. Spilde, and Carma M. Clah, *Online Sovereignty: The Law and Economics of Tribal Electronic Commerce*,
19 Vand. J. of Ent. & Tech. Law 1 (2016)......................................................5, 6, 7, 10, 11, 12

Cohen's Handbook of Federal Indian Law (2012) ........................................................5

Matthew L.M. Fletcher, *In Pursuit of Tribal Economic Development As a Substitute for Reservation Tax Revenue*,
80 N.D. L. Rev. 759 (2005) ..............................................................................5, 10

*The History and Culture of the Habematolel Pomo of Upper Lake*,
www.upperlakepomo.com /forms/brochure.pdf (last visited Oct. 31, 2017) .........................3

ICMN Staff, *Tribal Incubator Bill to Foster Entrepreneurship, Close the Employment Gap in Native Communities*, Indian Country Today (July 19, 2016),
https://indiancountrymedianetwork.com/news/business/tribal-incubator-bill-to-foster-entrepreneurship-close-the-employment-gap-in-native-communities/....................................7

Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs,
82 Fed. Reg. 4915 (Jan. 17, 2017) .........................................................................4

John Koppish, *Why Are Indian Reservations So Poor? A Look at the Bottom 1%*, Forbes
Magazine (Dec. 13, 2011), https://www.forbes.com/sites/johnkoppisch/2011/12/13/why-are-
indian-reservations-so-poor-a-look-at-the-bottom-1/#4924de4d3c07 .................................. 6-7

NAFSA, *Lac Vieux Desert Tribe—Frozen Homeland*,
https://nativefinance.org/media/
(last visited Oct. 31, 2017) .................................................................................................10, 11

NAFSA, *Otoe-Missouria Tribe—Sovereignty Through Economic Development*,
https://nativefinance.org/media/
(last visited Oct. 31, 2017) ......................................................................................................10

NAFSA, *Rocky Boy Chippewa Cree Tribe—Prosperity on the Plains*,
https://nativefinance.org/media/
(last visited Oct. 31, 2017) ......................................................................................................10

Naomi Schaeffer Riley, *One Way to Help Native Americans: Property Rights*, The Atlantic (July
30, 2016), https://www.theatlantic.com/politics/archive/2016/07/native-americans-property-
rights/492941/ .............................................................................................................................5

National Congress of American Indians, *Fiscal Year 2015 Indian Country Budget Request: An
Honorable Budget for Indian Country: Equitable Funding for Tribes* (Jan. 2014),
http://www.ncai.org/ncai_2014_budget_request.pdf ..................................................................6

Vince Sliwoski, *Tribal Cannabis Update: First Peoples Move Ahead*, Cannalawblog.com (Mar.
28, 2017), http://www.cannalawblog.com/category/native-american-tribes/ ...........................7

*Unemployment on Indian Reservations at 50 Percent:  the Urgent Need to Create Jobs in Indian
Country*:  Hearing Before the S. Comm. on Indian Affairs, 111th Cong. (2010),
https://www.indian.senate.gov/sites/default/files/upload/files/January2820102.pdf ...............6

U.S. Department of the Interior, Bureau of Indian Affairs, *Indian Affairs–Bureau Highlights*,
https://www.doi.gov/sites/doi.gov/files/uploads/fy2018_bib_bh077.pdf (last visited Oct. 31,
2017) ...........................................................................................................................................6

Kevin K. Washburn, *Trump Proposes Hundreds in Millions in Cuts to Federal Appropriations to
Indian Country*, Indian Country Today (May 25, 2017),
https://indiancountrymedianetwork.com/news/opinions/trump-proposes-hundreds-millions-
cuts-federal-appropriations-indian-country/ ..............................................................................6

## STATEMENT OF INTEREST[1]

The Native American Financial Services Association ("NAFSA") is a non-profit trade association advocating for tribal sovereignty, responsible financial services, and better economic opportunities in Indian Country.  NAFSA supports Native American tribal sovereignty by opposing discriminatory practices against tribal government-owned consumer lending businesses that operate in compliance with tribal and applicable federal laws.

The tribal governments that make up the NAFSA membership have formed Tribal Lending Entities ("TLEs") to engage in consumer lending enterprises, generally over the internet. TLEs provide financial services to a segment of the population that traditional banking interests have been unwilling to serve.  Each TLE operates as an arm of the tribal government that created it, with profits from the commercial enterprise funding crucial tribal governmental activities and offering a small, positive step toward alleviating the deprivation in tribal communities.  This increased tribal self-sufficiency in turn reduces the burden on American tax payers and the federal government.

To accompany the organization of TLEs, NAFSA member Tribes for many years have promulgated and enforced robust financial service laws and regulations.  The stability of these tribal laws and their consistent application is a normal function of modern governance.  NAFSA must defend the right of sovereign tribal governments to regulate their own economic entities and activities.

---

[1] This brief is filed pursuant to an October 27, 2017 order granting the Native American Financial Services Association's motion for leave to file an *amicus curiae* brief in support of Defendants' motion to dismiss.  No party or counsel for a party authored this brief in whole or in part.  No party, counsel for a party, or person other than *amicus curiae*, its members, or counsel made any monetary contribution intended to fund the preparation or submission of this brief.

## SUMMARY OF ARGUMENT

This case has the capacity to harm tribal governance and sovereignty for all 567 federally recognized Indian Tribes, not just those that have entered the financial services industry. NAFSA agrees with the arguments presented by the Defendants, including but not limited to, the principle that, pursuant to the laws of this Circuit and in accordance with the position of the Supreme Court of the United States, a federal statute of general applicability must expressly apply to tribal governments to authorize regulation of that sovereign's activities. Specifically, the term "person" does not include sovereigns, like Tribes, absent an affirmative showing of intent to the contrary, and certainly not when a statute expressly recognizes the unique sovereign status of Tribes. *NLRB v. Pueblo of San Juan*, 276 F.3d 1186, 1192 (10th Cir. 2002); *Inyo Cty., Cal. v. Paiute-Shoshone Indians of the Bishop Cmty.*, 538 U.S. 701, 709-10 (2003); *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 780-81 (2000).

The reasons underlying this requirement of Congressional specificity go directly to the core of NAFSA's mission: to support the federally protected and absolutely critical ability of Tribes and tribal governments to engage in revenue-raising activity and achieve economic self-determination. *See* Amd. Mem. in Support of Defs.' Mot. to Dismiss at 13-15 (Oct. 10, 2017), ECF No. 62. The federal government and federal courts have repeatedly upheld the unique ability of Tribes to engage in commercial-governmental activity and the federal obligation to respect and protect that right.[2] This case is important because it tests whether a rogue agency, in the absence of specific Congressional direction and consumed with a singular, unrelated mission, can unilaterally override this well-recognized federal responsibility to American Indians.

---

[2] *Cherokee Nation v. Georgia*, 30 U.S. 1, 17 (5 Pet.) (1831); *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2028-31 (2014) (reviewing legal history and status of "Indian tribes as 'domestic dependent nations' that exercise 'inherent sovereign authority'").

The actions of the Consumer Financial Protection Bureau ("CFPB") attempt to thwart financial lending activity by TLEs—economic development activity that is essential to tribal governments unable to raise revenues through traditional taxation authority.  TLEs and e-commerce generally offer Tribes a way to overcome old federal Indian policies that sought to isolate and terminate Tribes, limited economic opportunities, and led to institutionalized poverty in tribal communities.  TLEs also support tribal sovereignty and self-sufficiency by generating revenue needed to provide basic social services to tribal members.

In the instant case, the economic development opportunity provided by tribal lending is essential.  The TLE Defendants serve a unique and irreplaceable function for the Habematolel Pomo of Upper Lake (the "HPUL"), a Tribe that continues to suffer the harsh effects of antiquated and long-abandoned federal Indian policies.  The history of the HPUL people is gruesome.[3]  They have been slaughtered, removed, terminated, and made to endure extended litigation in order for their continual sovereignty to be federally re-recognized and resurrected on a small parcel of trust land in a remote area of California.  With no real tax base, no nearby population center to draw from for gaming revenue, and no resources to harvest, e-commerce and the ability to create a favorable, responsibly managed regulatory environment are the sole avenue for this historically plundered Tribe to achieve economic independence and self-determination.  Importantly, unless and until Congress specifically limits the Tribe's authority to engage in this type of sovereign regulatory and contracting activity—which to date it has decidedly not—it is inappropriate for the CFPB to do so.

---

[3] *The History and Culture of the Habematolel Pomo of Upper Lake*, www.upperlakepomo.com /forms/brochure.pdf (last visited Oct. 31, 2017).

## REASONS FOR GRANTING THE MOTION TO DISMISS

**I.     The Motion to Dismiss Should Be Granted for the Reasons Stated by Defendants.**

NAFSA agrees with reasons for granting the Motion to Dismiss stated by Defendants. In the interests of brevity, NAFSA hereby adopts and incorporates those reasons by reference.

**II.    The CFPB's Overreach Threatens Tribes' Legal, Sovereign Economic Development Efforts.**

> *a) The Legal, Sovereign (and Necessary) Authority of Tribal Governments to Engage in Commercial Activity as Governmental Economic Development.*

There are 567 federally recognized Tribes in the United States,[4] each actively working to provide basic social services to its members through exercise of its sovereign right to self-determination. While United States law has always recognized tribal sovereignty and the self-determination of tribal governments, tribal governments face significant hurdles in achieving economic independence and self-sufficiency. Tribal governments lack taxation parity when compared to the revenue raising abilities of sister sovereigns. States and municipalities, which have the capacity to leverage revenue from direct taxes, business tax credits, mortgages on real estate and other traditional state-owned enterprises, but these tools are not fully available to Tribes. Double taxation schemes,[5] constant encroachment from state authorities,[6] and legal and bureaucratic restrictions rendering reservation trust lands incapable of being leveraged to raise

---

[4] Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 82 Fed. Reg. 4915 (Jan. 17, 2017).

[5] *See, e.g.*, *Michigan*, 134 S. Ct. at 2042-45 (Sotomayor, J., concurring) (general discussion of economic development obstacles for Tribes, including the likelihood of double taxation). States may manipulate tax rates to attract out-of-state business, but prior rulings of this and other courts deny these opportunities to Tribes. *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980); *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134 (1980); *Moe v. Confederated Salish & Kootenai Tribes of the Flathead Reservation*, 425 U.S. 463 (1976); *Barona Band of Mission Indians v. Yee*, 528 F.3d 1184 (9th Cir. 2008).

[6] *See, e.g.*, *Okla. Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla.*, 498 U.S. 505 (1991); *Puyallup Tribe, Inc. v. Dep't of Game of Wash.*, 433 U.S. 165 (1977); *Wyoming v. EPA*, 849 F.3d 861 (10th Cir. 2017).

capital or support community development,[7] create almost insurmountable hurdles for tribal governments seeking opportunities for economic independence.   This reality leaves tribal governments with limited opportunities to mitigate the widespread poverty, stagnant economies, and lack of basic social services and infrastructure continuing to plague tribal communities.[8]

This is particularly true given that the majority of Tribes are located in remote, isolated areas, far from population centers and existing or potential economic markets.[9]  This geographic isolation, largely a result of historical federal Indian reservation policies, severely limits contemporary tribal economic opportunities.[10]  For example, to create a successful gaming operation—a commercial activity that has positively impacted a handful of tribal governments— a Tribe must possess trust lands with physical access to consumers from larger population centers.[11]  In fact, in order to develop almost any type of market for goods and services a Tribe must have access to non-Indian consumers.[12]  Without the development of these markets, Tribes

---

[7] *See* Cohen's Handbook of Federal Indian Law § 15.06[1] (2012); Naomi Schaeffer Riley, *One Way to Help Native Americans: Property Rights*, The Atlantic (July 30, 2016), https://www.theatlantic.com/politics/archive/2016/07/native-americans-property-rights/492941/.

[8] *See* Riley, *supra* note 7; *see also* Randall K.Q. Akee & Jonathan B. Taylor, *Social and Economic Change on American Indian Reservations: A Databook of the US Censuses and the American Community Survey 1990–2010* (2014), http://static1.squarespace.com/static/52557b58e4b0d4767401ce95/t/5379756ce4b095f55e75c77b /1400468844624/AkeeTaylorUSDatab   ook2014-05-15.pdf   [https://perma.cc/P9YK-ZEUE] (providing a general overview of the poverty of tribal communities).

[9] *See* Gavin Clarkson, Katherine A. Spilde, and Carma M. Clah, *Online Sovereignty: The Law and Economics of Tribal Electronic Commerce*, 19 Vand. J. of Ent. & Tech. Law 1, 21-23 (2016) (hereinafter "Clarkson, Spilde and Clah").  Dr. Clarkson currently serves as the Deputy Assistant Secretary for Policy and Economic Development—Indian Affairs at the Department of Interior, but was not consulted about this brief.

[10] Donald L. Barlett & James B. Steele, *Wheel of Misfortune*, TIME, Dec. 16, 2002, at 44; *see also* Clarkson, Spilde and Clah, *supra* note 9, at 6-7.

[11] *See* Barlett & Steele, *supra* note 10, at 44; *see also* Clarkson, Spilde and Clah, *supra* note 9, at 6-7, 36.

[12] *See, e.g.*, Matthew L.M. Fletcher, *In Pursuit of Tribal Economic Development As a Substitute for Reservation Tax Revenue*, 80 N.D. L. Rev. 759 (2005).

face incredible unemployment.[13]  In turn, without jobs, tribal economies remain dependent on outside sources of funding.  In this way, most tribal efforts to initiate economic development on remote reservations occur in a closed, negative feedback loop.

In addition to geographic isolation and disadvantageous policies, there have been cuts to federal funding for Tribes for decades.[14]  The proposed Fiscal 2018 budget continues this long-term trend, proposing to cut an additional 303.3 million dollars from the Bureau of Indian Affairs, roughly 150 million dollars from the Indian Health Service, and more than 50 million dollars from Indian country housing programs, further reducing funding for tribal social services and programs.[15]  These cuts disenfranchise Native Americans, endanger the viability of tribal communities, and perpetuate generational poverty among tribal members.[16]

Facing these obstacles, tribal governments must seek novel revenue streams to fill extensive federal-funding gaps that leave unaddressed numerous, basic infrastructure and social service needs.[17]  In contemporary times, the internet and e-commerce offer Tribes a ray of hope.

---

[13] *See generally Unemployment on Indian Reservations at 50 Percent:  the Urgent Need to Create Jobs in Indian Country*:  *Hearing Before the S. Comm. on Indian Affairs*, 111th Cong. (2010), https://www.indian.senate.gov/sites/default/files/upload/files/January2820102.pdf.

[14] National Congress of American Indians, *Fiscal Year 2015 Indian Country Budget Request: An Honorable Budget for Indian Country: Equitable Funding for Tribes*, at 19 & fig.2 (Jan. 2014), http://www.ncai.org/ncai_2014_budget_request.pdf (showing Indian Affairs funding declining from 0.20 percent of the federal budget in 1979 to 0.08 percent of the federal budget in 2012).

[15] U.S. Dep't of the Interior, Bureau of Indian Affairs, *Indian Affairs–Bureau Highlights*, at BH-77 & BH-81, https://www.doi.gov/sites/doi.gov/files/uploads/fy2018_bib_bh077.pdf (last visited Oct. 31, 2017); Kevin K. Washburn, *Trump Proposes Hundreds in Millions in Cuts to Federal Appropriations to Indian Country*, Indian Country Today (May 25, 2017), https://indiancountrymedianetwork.com/news/opinions/trump-proposes-hundreds-millions-cuts-federal-appropriations-indian-country/.

[16] Duane Champagne, *Breaking the Cycle of Poverty and Crime in Indian Country*, Indian Country Today (Oct. 6, 2013), https://indiancountrymedianetwork.com/news/politics/breaking-the-cycle-of-poverty-and-crime-in-indian-country/; *See generally* Akee & Taylor, *supra* note 8; *see generally* Clarkson, Spilde and Clah, *supra* note 9, at 4.

[17] John Koppish, *Why Are Indian Reservations So Poor? A Look at the Bottom 1%*, Forbes Magazine (Dec. 13, 2011), https://www.forbes.com/sites/johnkoppisch/2011/12/13/why-are-

Through the internet, a Tribe can allow a broader group of consumers access to on-reservation goods and services.[18]   In every other context, the use of internet technologies to develop geographically distant commercial relationships and the ability to extend a sovereign's jurisdiction through contracting are well-recognized legal principles.[19]   Unfortunately, just as tribal sovereign authority has existed since time immemorial, so has a reactionary, non-Indian skepticism to most assertions of it.   It is an old story for Tribes to be met with staunch opposition when fighting to carve a niche for themselves in an industry.[20]   Tribal lending is no exception. However, gaining a foothold in emerging markets is essential if Tribes are to be successful in providing basic services to their members and, in turn, produce industrious citizens capable of promoting the welfare of their Tribes and the nation.[21]

---

indian-reservations-so-poor-a-look-at-the-bottom-1/#4924de4d3c07; *see also* ICMN Staff, *Tribal Incubator Bill to Foster Entrepreneurship, Close the Employment Gap in Native Communities*, Indian Country Today (July 19, 2016), https://indiancountrymedianetwork.com/news/business/tribal-incubator-bill-to-foster-entrepreneurship-close-the-employment-gap-in-native-communities/; *see generally* Gavin Clarkson & Jim Sebenius, *Leveraging Tribal Sovereignty for Economic Opportunity: A Strategic Negotiations Perspective*, 76 Mo. L. Rev. 1045 (2011).

[18] *See* Clarkson, Spilde and Clah, *supra* note 9, at 17.

[19] The U.S. Supreme Court has consistently found that consumers may negotiate contracts subject to geographically distant laws and jurisdictions.  *See, e.g.*, *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 592-95 (1991); *see also Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299 (1978) (holding that the National Banking Act authorizes the charging of out-of-state credit card customers an interest rate allowed by the bank's home state).

[20] *See, e.g.*, *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987) (challenge to right of Tribes to engage in gaming activities on reservation land); *see also Rothe Dev., Inc. v. U.S. Dep't of Defense*, 836 F.3d 57 (D.C. Cir. 2016) (challenging government contracting rules assisting historically disadvantaged communities including Native Americans), *cert. denied*, No. 16-1239, 2017 WL 1375832 (U.S. Oct. 16, 17, 2017); Vince Sliwoski, *Tribal Cannabis Update: First Peoples Move Ahead*, Cannalawblog.com (Mar. 28, 2017), http://www.cannalawblog.com/category/native-american-tribes/ (discussing the challenges to Tribes considering entering the commercial cannabis industry).

[21] *E.g.*, *Michigan*, 134 S. Ct. at 2043 (Sotomayor, J., concurring) (discussing the federal government's desire that Tribes become more self-sufficient rather than rely on federal funding).

b) *The CFPB's Actions Contravene Federal Law and Policy and Constitute Clear Overreach.*

The Dodd-Frank Wall Street Reform and Consumer Financial Protection Act of 2010 ("CFPA"), Pub. L. No. 111-203, 124 Stat. 1376, displays a strong adherence to the long-standing federal respect for tribal sovereignty and the regulatory authority of Tribes.  By defining Tribes as "States," Congress took the express, positive step to recognize and differentiate Tribes from general actors or "persons."  Further, the Act commands the CFPB to <u>coordinate</u> its regulatory efforts with Indian Tribes and their TLEs.[22]  Nor did Congress, as the CFPB must contend for its arguments to succeed, create a novel distinction between Tribes and tribal commercial entities—recognizing the unique status of the former but abandoning the same respect for the latter.[23]  In fact, Congress and federal courts have long recognized the rights and abilities of Tribes to fulfill government revenue raising functions through commercial activities.[24]  We must assume Congress understood this bedrock and consistently upheld legal principle when deciding to expressly identify Tribes as sovereign regulators under the CFPA.

Under the CFPA and well-settled legal precedent, TLEs are to be treated as the arms-of-sovereigns engaged in government revenue development efforts.[25]  Allowing the CFPB to treat

---

[22] *See* 12 U.S.C. § 5495; *see also id.* § 5493(c)(2)(B).

[23] *See* CFPB Compl. for Permanent Injunction and Other Relief ¶ 7 (Apr. 27, 2017), ECF No. 1 ("All Defendants are companies that are owned and incorporated by the Habematolel Pomo of Upper Lake Indian Tribe . . . ."); *but see id.* ¶¶ 13, 19, 24, 29 (identifying each of the Tribal entities as a "covered person" under the CFPA).

[24] *See, e.g.*, the Native American Business Development, Trade Promotion and Tourism Act of 2000, 25 U.S.C. § 4302 (expressing defining "Tribal enterprise" as "a commercial activity or business managed or controlled by an Indian tribe"); *Michigan*, 134 S. Ct. at 2037 (collecting cases discussing the sustained immunity of tribal enterprises engaging in commercial activity).

[25] *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183-84 (2010) (noting that "tribal governments directly control or participate in commercial activities more frequently than other types of governments.  The tribal organization may be part of the tribal government and protected by tribal immunity, even though it may have a separate corporate structure.") (citation and internal alterations omitted); *Finn v. Great Plains Lending*,

TLEs as mere "persons," and thereby allowing the CFPB to sidestep Congress's express recognition of the sovereignty of tribal governments in the agency's own organic statute, chills the ability of TLEs to engage in this type of government revenue generation and deprives tribal members of the myriad benefits these tribal enterprises provide (discussed in Section III, *infra*). Furthermore, it allows the unchecked political motivations of a very new agency to negate hundreds of years of legal precedent and Congress's express direction. The CFPB has made clear its efforts to impose state laws on Tribes and drive TLEs out of the online consumer financial services industry.[26]

This Court must grant the Defendants' Motion to ensure that the CFPB acts in accordance with the CFPA and with the general trust relationship between the United States and the Indian people that the Supreme Court of the United States has long recognized. *United States v. Mitchell*, 463 U.S. 206, 225 (1983); *Seminole Nation v. United States*, 316 U.S. 286, 297 (1942)

---

No. 16-415, 2016 WL 6537986, at *3 (W.D. Okla. Nov. 3, 2016) (mere accusations of "renting" a Tribe are insufficient to overcome the sovereign immunity of a TLE), *vacated*, No. 16-6348, 2017 WL 2376550 (10th Cir. June 1, 2017); *Everette v. Mitchem*, No. 15-1261, 2016 WL 470840 (D. Md. Feb. 8, 2016) (case dismissed for failure to state a claim stemming from sovereign immunity imputed from Tribe to TLEs); *Bynon v. Mansfield*, No. 15-00206, 2016 WL 4089169, at *4 (E.D. Pa. May 21, 2015) (tribal sovereign immunity extends to the manager of a TLE acting in his/her official capacity); *Churchill Fin. Mgmt. Corp. v. ClearNexus, Inc.*, 802 S.E.2d 85 (Ga. Ct. App. 2017) (sovereign immunity of TLE applies to arbitration proceedings); *Great Plains Lending v. Conn. Dep't of Banking*, Mem. of Decision, No. HHB-CV-15-6028096-S (Conn. Super. Ct. Nov. 23, 2015) (tribal sovereign immunity of a TLE extends to administrative actions by state agencies).

[26] *See* Complaint for Permanent Injunction and Other Relief, Consumer Financial Protection Bureau v. Golden Valley Lending, Inc., *et al.*, No. 1:17-cv-03155 (N.D. Ill. Apr. 27, 2017), ECF No. 1, http://files.consumerfinance.gov/f/documents/201704_cfpb_Golden-Valley_Silver-Cloud_Majestic-Lake_complaint.pdf (alleging that TLEs are required to follow the laws of various states); *see In the Matter of: Zero Parallel, LLC*, No. 2017-CFPB-0017, Consent Order ¶ 26 (CFPB Sept. 6, 2017), http://files.consumerfinance.gov/f/documents/201709_cfpb_zero-parallel-llc_consent-order.pdf ("[N]o Person may take into consideration any contention that state or federal law is inapplicable, or that lenders are not subject to state or federal law, because of lender sovereignty or a lender's foreign, offshore, or tribal status or affiliation, or because of choice of foreign or tribal law.").

(the United States "has charged itself with moral obligations of the highest responsibility and trust" towards Indian tribes).

### III.    TLEs Are Helping to Alleviate Tribal Poverty Among Native Americans.

E-commerce and online tribal lending activities bring consumers to remote, isolated Tribes where other markets fail to thrive.  This virtual trading route is immensely important to many tribal economies.  In particular, the online financial services industry is creating jobs on tribal land and is putting money back into social services, including education, healthcare, housing, public safety, and infrastructure development.[27]  Some Tribes are able to support nearly 50 percent their government's general fund through its TLEs,[28] while other tribal governments are 100 percent funded by TLE revenues.[29]  Even more, this type of economic development allows many Tribes to avoid a reliance on natural resource extraction that runs counter to their cultural identity.[30]

For isolated rural Tribes, the financial success of the online marketplace "extend[s] the opportunity for tribes to move beyond sheer subsistence and basic economic survival.  Internet commerce gives tribal governments hope in their ability to depart from past struggles for survival to legitimate possibilities for continued economic growth, prosperity, and success."[31]  To date, meta-analysis and statistical quantifications of the benefits of e-commerce in tribal communities is understudied and largely unavailable.  However, anecdotal evidence abounds.  In particular,

---

[27] Clarkson, Spilde and Clah, *supra* note 9, at 16-17; *see, e.g.*, NAFSA, *Rocky Boy Chippewa Cree Tribe—Prosperity on the Plains*, https://nativefinance.org/media/ (last visited Oct. 31, 2017); NAFSA, *Otoe-Missouria Tribe—Sovereignty Through Economic Development*, https://nativefinance.org/media/ (last visited Oct. 31, 2017).

[28] NAFSA, *Lac Vieux Desert Tribe—Frozen Homeland*, https://nativefinance.org/media/ (last visited Oct. 31, 2017).

[29] Clarkson, Spilde and Clah, *supra* note 9, at 23.

[30] *See* Fletcher, *supra* note 12, at 778-84.

[31] Clarkson, Spilde and Clah, *supra* note 9, at 17.

the experiences of three Tribes illustrate the positive impact of e-commerce. The Lac Vieux Desert Band of Lake Superior Chippewa is located in isolated Watersmeet, Michigan, 30-50 miles from the nearest towns. The long, harsh winters can isolate tribal members for months at a time. The Tribe's TLEs directly support programs such as housing, education, community health clinics, scholarships, and propane assistance. With extreme winter temperatures dropping under forty degrees below zero, and propane peaking at $9 a gallon at times, without the housing and propane assistance provided by TLE revenues the health and safety of many tribal members would be at risk.[32]

The Otoe-Missouria Tribe, in rural Red Rock, Oklahoma, has found success with its TLEs. During the first years of lending, the Tribe was able to invest 100 percent of TLE revenues into tribal housing renovation and creation, after federal funding failed to be made available despite years of waiting. Later, the Tribe invested in tribal programs, including education, building and infrastructure maintenance, elders' services, and economic development. TLEs' revenues also allowed for investment in cultural preservation and language revitalization.[33]

The Defendant Tribe, HPUL in California, currently generates 100 percent of its governmental budget from TLEs.[34] The Tribe's TLEs fund services such as elder assistance, youth education, clothing, burial assistance, and other tribal charitable programs. Revenues also supplement the scholarship programs, culturally based education programs, and acquisition of historically significant tribal lands by the Tribe.[35] TLEs' operations are a key factor in the economic stability of a Tribe, and its profits are also used to pay down existing tribal debt,

[32] *Id.* at 19-20; *see also Frozen Homeland*, *supra* note 28.
[33] Clarkson, Spilde and Clah, *supra* note 9, at 20-22.
[34] *Id.* at 22-24.
[35] *Id.* at 23.

including the tribal casinos, which, as of 2014, were not profitable.[36]

As these examples show, Tribes are utilizing TLEs' revenues to make their communities better—providing services and education to meet the needs of their members.  As government enterprises, engaging in sovereign economic activity, these TLEs fall directly into the sovereign category of actors created by Congress when it defined "States," and Tribes as States.

## CONCLUSION

The Motion to Dismiss should be granted.

Respectfully submitted,

WALLACE SAUNDERS

_____

Nathaniel A. Dulle KS 23295
10111 West 87th Street
Overland Park, KS 66212
Telephone: (913) 888-1000
Facsimile: (913) 888-1065
ndulle@wallacesaunders.com
*Attorneys for* Amicus Curiae *Native American Financial Services Association*

October 31, 2017

---

[36] *Id.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing Brief As *Amicus Curiae* by the Native American Financial Services Association in Support of Defendants' Motion to Dismiss was electronically filed with the United States District Clerk using the CM/ECF system which sent notification and provided access to a copy of this filing on the 31st day of October, 2017, to:

| | |
|---|---|
| Plaintiff — Consumer Financial Protection Bureau | Gabriel Sean Harris Hopkins<br>Consumer Financial Protection Bureau Enforcement<br>1700 G Street NW<br>Washington, DC 20552<br>202-435-7842<br>Email: gabriel.hopkins@cfpb.gov |
| Plaintiff — Consumer Financial Protection Bureau | Stephen Jacques<br>Consumer Financial Protection Bureau<br>1700 G Street Northwest<br>Washington, DC 20552<br>202-435-7368<br>Email: stephen.jacques@cfpb.gov |
| Plaintiff — Consumer Financial Protection Bureau | Vanessa Anne Buchko<br>Consumer Financial Protection Bureau<br>1700 G Street NW<br>Washington, DC 20552<br>202-435-7000<br>Email: vanessa.buchko@cfpb.gov |
| Defendants —<br>Golden Valley Lending, Inc.<br>Silver Cloud Financial, Inc.<br>Mountain Summit Financial, Inc.<br>Majestic Lake Financial, Inc. | Beth A. Wilkinson<br>Wilkinson Walsh + Eskovitz, LLC<br>2001 M Street, NW, 10th Floor<br>Washington, DC 22036<br>202-847-4010<br>Fax: 202-847-4005<br>Email: bwilkinson@wilkinsonwalsh.com |
| Defendants —<br>Golden Valley Lending, Inc.<br>Silver Cloud Financial, Inc.<br>Mountain Summit Financial, Inc. | Brant W. Bishop<br>Wilkinson Walsh + Eskovitz, LLC<br>2001 M Street, NW, 10th Floor<br>Washington, DC 22036 |

| | |
|---|---|
| Majestic Lake Financial, Inc. | 202-847-4050<br>Fax: 202-847-4005<br>Email: bbishop@wilkinsonwalsh.com |
| Defendants —<br>Golden Valley Lending, Inc.<br>Silver Cloud Financial, Inc.<br>Mountain Summit Financial, Inc.<br>Majestic Lake Financial, Inc. | Lori Alvino McGill<br>Wilkinson Walsh + Eskovitz, LLC<br>2001 M Street, NW, 10th Floor<br>Washington, DC 22036<br>202-847-4035<br>Fax: 202-847-4005<br>Email: lalvinomcgill@wilkinsonwalsh.com |
| Defendants —<br>Golden Valley Lending, Inc.<br>Silver Cloud Financial, Inc.<br>Mountain Summit Financial, Inc.<br>Majestic Lake Financial, Inc. | Paul M. Croker<br>Armstrong Teasdale LLP - KC<br>2345 Grand Boulevard, Suite 1500<br>Kansas City, MO 64108-2617<br>816-221-3420<br>Fax: 816-221-0786<br>Email: pcroker@armstrongteasdale.com |
| Defendants —<br>Golden Valley Lending, Inc.<br>Silver Cloud Financial, Inc.<br>Mountain Summit Financial, Inc.<br>Majestic Lake Financial, Inc. | Rakesh Kilaru<br>Wilkinson Walsh + Eskovitz, LLC<br>2001 M Street, NW, 10th Floor<br>Washington, DC 22036<br>202-847-4046<br>Fax: 202-847-4005<br>Email: rkilaru@wilkinsonwalsh.com |
| Amicus — Habematolel Pomo of Upper Lake Consumer Financial Services Regulatory Commission | Barry R. Grissom<br>Polsinelli PC - 48th Street<br>900 W. 48th Place, Suite 900<br>Kansas City, MO 64112-1895<br>816-753-1000<br>Fax: 816-753-1536<br>Email: bgrissom@polsinelli.com |
| Amicus — Habematolel Pomo of Upper Lake Consumer Financial Services Regulatory Commission | Brendan V. Johnson<br>Robins Kaplan, LLP - Sioux Falls<br>101 South Main Avenue, Suite 100<br>Sioux Falls, SD 57104<br>605-335-1300<br>Fax: 612-339-4181<br>Email: bjohnson@robinskaplan.com |
| Amicus — Habematolel Pomo of Upper Lake Consumer Financial Services Regulatory Commission | Sarah J. Auchterlonie<br>Carlton Fields Jorden Burt PA<br>1025 Thomas Jefferson Street, NW, Suite 400- |

| | East<br>Washington, DC 20007-5208<br>202-965-8100<br>Fax: 202-965-8104<br>Email: SJA@CarltonFields.com |
| --- | --- |
| Amicus — Habematolel Pomo of Upper Lake Consumer Financial Services Regulatory Commission | Timothy W. Billion<br>Robins Kaplan, LLP - Minneapolis<br>800 LaSalle Avenue, Suite 2800<br>Minneapolis, MN 55402<br>612-349-8475<br>Fax: 612-339-4181<br>Email: tbillion@robinskaplan.com |

WALLACE SAUNDERS

Nathaniel A. Dulle KS 23295
10111 West 87th Street
Overland Park, KS 66212
Telephone: (913) 888-1000
Facsimile: (913) 888-1065
ndulle@wallacesaunders.com
*Attorneys for* Amicus Curiae *Native American Financial Services Association*