IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | ) ) ) | |
| Plaintiff, | ) ) | Case No.:  2:17-cv-02521-JAR-JPO |
| v. | ) ) | Hon. Julie A. Robinson |
| GOLDEN VALLEY LENDING, INC., et al., | ) ) ) | |
| Defendants. | ) ) | |

**BRIEF OF HABEMATOLEL POMO OF UPPER LAKE CONSUMER FINANCIAL SERVICES REGULATORY COMMISSION AS *AMICUS CURIAE* SUPPORTING DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

I.      INTEREST OF AMICUS CURIAE ................................................................ 1

II.     NATURE OF THE MATTER ........................................................................ 1

III.    STATEMENT OF FACTS ............................................................................. 2

IV.     QUESTION PRESENTED ............................................................................ 3

V.      ARGUMENT ............................................................................................... 3

        A.      Congress Directed the Bureau to Protect Consumers by "Coordinating" with Co-Regulators like the Commission. .............................................. 4

                1.      The Commission actively regulates all lending entities within its jurisdiction. ........................................................................... 4

                2.      The Commission already addressed the issues raised in the Bureau's TILA claims. ......................................................... 6

                3.      The Bureau has itself violated the CFPA Section 1015 ............................ 7

        B.      The Bureau does not have the Authority to Maintain this Action. ........................ 8

                1.      The Tribe is a sovereign co-regulator, not a "Person" subject to the Bureau's enforcement authority. ............................................... 8

                2.      No precedent supports this action. ......................................... 11

                3.      The CFPA prohibits the Bureau from enforcing state law or setting usury limits.  The Bureau would have this Court read those express limitations out of the CFPA. ................................................. 14

        C.      The Bureau's Interpretations Lack Limiting Principles. ...................................... 17

                1.      If tribally-owned entities are "Covered Persons," so are other government-owned businesses. ............................................... 17

                2.      The Bureau's theory could extend to clearly lawful interstate lending. ........................................................................... 18

                3.      Contractual Choice of Law Is Critical to Commerce. ............................... 19

VI.     CONCLUSION ............................................................................................. 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Boyd Rosene & Associates. v. Kansas Municipal Gas Agency*,
 174 F.3d 1115 (10th Cir.1999) ......................................................................................20

*CFPB v. CashCall, Inc.*,
 Civ. No. 15-7522-JFW, 2016 U.S. Dist. LEXIS 130584 (C.D. Cal. Aug. 31, 2016)..............13

*CFPB v. Great Plains Lending, LLC*,
 846 F.3d 1049 (9th Cir. 2017),
 *petition for cert. filed* (August 2017) .................................................................................11, 12

*CFPB v. Great Plains Lending, LLC*,
 Case No. CV-14-2090, Doc. 28 (filed May 27, 2014) (D.C. C. Cal. 2014),
 *aff'd, CFPB v. Great Plains Lending, LLC*, No. 14-55900 (9th Cir. 2017) ...........................10

*Comm'n v. Citizen Band Potawatomi Tribe of Okla.*,
 498 U.S. 505 (1991)..........................................................................................................9

*Cty. of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*,
 502 U.S. 251 (1992)...........................................................................................................13

*Donovan v. Coeur d'Alene Tribal Farm*,
 751 F.2d 1113 (9th Cir. 1985) ........................................................................................12, 13

*EEOC v. Karuk Tribe Hous. Auth.*,
 260 F.3d 1071 (9th Cir. 2001) ..........................................................................................12

*EEOC v. Randstad*,
 685 F.3d 433 (4th Cir. 2012) ............................................................................................12

*Federal Power Commission v. Tuscarora Indian Nation*,
 362 U.S. 99 (1960)............................................................................................................13

*Fish v. Kobach*,
 840 F.3d 710 (10th Cir. 2016) ............................................................................................9

*FTC v. Cliffdale Associates, Inc.*,
 103 F.T.C. 110 (1984)........................................................................................................5

*FTC v. Freecom Communs.*,
 401 F.3d 1192 (10th Cir. 2005) ..........................................................................................5

*Great Plains Lending, LLC v. CFPB*,
 No. 17-184 (Sept. 5, 2017)................................................................................................17

*In Re Great Plains Lending, LLC; Mobiloans, LLC; and Plain Green, LLC,*
   2013-MISC-Great Plains Lending-0001 (Sept. 26, 2013) .......................................................17

*In re K.M.H.,*
   285 Kan. 53, 169 P.3d 1025 (2007) ........................................................................................20

*In re Zero Parallel, Inc.,*
   2017-CFPB-0017 (Sept. 6, 2017) ............................................................................................10

*Inyo Cnty. v. Paiute-Shoshone Indians of the Bishop Cmty. of Bishop Colony,*
   538 U.S. 701 (2003) ..............................................................................................................8, 12

*Kiowa Tribe of Okla. v. Mfg. Techs., Inc.,*
   523 U.S. 751 (1998) ...................................................................................................................9

*Layne Christensen Co. v. Zurich Canada,*
   30 Kan.App.2d 128, 38 P.3d 757 (2002) ................................................................................20

*Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.,*
   439 U.S. 299, 314-15 (1978) ..................................................................................................16

*Meyers v. Oneida Tribe of Indians of Wis.,*
   836 F.3d 818 (7th Cir. 2016) ....................................................................................................9

*Michigan v. Bay Mills Indian Cmty.,*
   134 S. Ct. 2024 (2014) .........................................................................................................9, 10

*Montana v. Blackfeet Tribe of Indians,*
   471 U.S. 759 (1985) .................................................................................................................13

*Moses v. Halstead,*
   581 F.3d 1248 (10th Cir. 2009) ...............................................................................................20

*NLRB v. Pueblo of San Juan,*
   276 F.3d 1186 (10th Cir. 2002) (en banc) .........................................................................12, 13

*Puyallup Tribe, Inc. v. Dep't of Game of Wash.,*
   433 U.S. 165 (1977) ...................................................................................................................9

*Soaring Eagle Casino & Resort v. NLRB,*
   791 F.3d 648 (6th Cir. 2015) ...................................................................................................12

*United States v. Cooper Corp.,*
   312 U.S. 600 (1941) ...................................................................................................................8

*United States v. United States Fidelity & Guaranty Co.,*
   309 U.S. 506 (1940) .................................................................................................................10

*United States v. Wheeler*,
  435 U. S. 313 (1978) ................................................................................9

*Vermont Agency of Natural Res. v. United States ex rel. Stevens*,
  529 U.S. 765 (2000) ............................................................................8, 12

*Washington v. Confederated Tribes of Colville Indian Reservation*,
  447 U.S. 134, 165 (1980) ......................................................................17

*Yavuz v. 61 MM, Ltd.*,
  465 F.3d 418 (10th Cir. 2006) ...............................................................20

**Statutes**

12 U.S.C. § 81 ............................................................................................18

12 U.S.C. § 85 ............................................................................................16

12 U.S.C. § 5481(12) ...................................................................................5

12 U.S.C. § 5481(19) ...................................................................................8

12 U.S.C. § 5481(26)(A) ............................................................................14

12 U.S.C. § 5481(27) .............................................................................8, 18

12 U.S.C. § 5495 .....................................................................................7, 8

12 U.S.C. § 5517(o) ...................................................................................14

12 U.S.C. § 5531 ...........................................................................5, 12, 14

12 U.S.C. § 5531(a) ...................................................................................15

12 U.S.C. § 5536(a)(1)(A) .........................................................................15

12 U.S.C. § 5564(a) .....................................................................................8

12 U.S.C. § 5564(c) .....................................................................................8

15 U.S.C. § 45(a)(1) .....................................................................................5

15 U.S.C. § 1681m(e) ..................................................................................5

15 U.S.C. § 1681w ......................................................................................5

15 U.S.C. § 6801 ..........................................................................................5

28 U.S.C. § 3002(10) ...................................................................................9

**Other Authorities**

12 C.F.R. § 190.3 .................................................................................................18

Depository Institutions Deregulation and Monetary Control Act of 1980, Public
    Law 96-221, 94 Stat. 161 ...........................................................................18

Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Title X
    (Pub. L. 111-203, H.R. 4173 ........................................................................1

FTC Policy Statement on Deception (October 14, 1983) ................................5

Gavin Clarkson et al., *Online Sovereignty: The Law and Economics of Tribal
    Electronic Commerce*, 19 Vand. J. Ent. & Tech. L. 1, 13 (Fall 2016) .............9, 10, 11, 15, 19

Restatement (First) of Conflicts of Law § 358 (1934) ...................................20

Restatement (First) of Conflict of Laws § 332 (1934) ...................................20

Restatement (Second) of Conflict of Laws § 187 .........................................20

## INTRODUCTION

The Consumer Financial Protection Bureau ("Bureau") refuses to acknowledge the legitimacy of Indian tribes as co-regulators under the Consumer Financial Protection Act ("CFPA").[1]  By filing this lawsuit, the Bureau is trying to usurp the role of tribal regulators and obtain powers that Congress explicitly withheld from the Bureau.  The Bureau's ambition is contrary to federal law and policy and unnecessary to achieve the proper objectives of the Bureau.

## I.   INTEREST OF AMICUS CURIAE[2]

Amicus Curiae, the Habematolel Pomo of Upper Lake Consumer Financial Services Regulatory Commission ("Commission"), was created by the Habematolel Pomo of Upper Lake Tribe ("Tribe") to license and regulate the Tribe's lending businesses.  The Commission operates independently of the Tribe to enforce tribal and applicable federal consumer financial-protection laws.  Accordingly, the Commission has an interest in defending its own regulatory power and the right of tribal governments to regulate their own economic entities.

## II.   NATURE OF THE MATTER

The Bureau filed suit against four economic development arms of the Tribe: Golden Valley Lending, Inc.; Silver Cloud Financial, Inc.; Mountain Summit Financial, Inc.; and Majestic Lake Financial, Inc. (collectively, the "Tribal Lenders").  The Complaint alleges that the Tribal Lenders violated the CFPA by engaging in deceptive acts when they collected payments on loans that were "void" or "voidable" either because the interest rate exceeded various state usury-law

---

[1] Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Title X (Pub. L. 111-203, H.R. 4173).

[2] No party's counsel authored any part of this brief, and no party, party's counsel, person, or entity other than the amicus curiae, its members, or its counsel contributed money toward the authorship or production of this brief.

limits or because Tribal Lenders did not obtain the proper state licensing.  (Counts I, II, and III.)

The Complaint also alleges that the Tribal Lenders violated the Truth in Lending Act ("TILA")

and Regulation Z by failing to properly disclose the annual percentage rate on loans.  (Counts IV

and V.)[3]  The Tribal Lenders have moved to dismiss the claims.  The Commission supports their

motion.

## III.   STATEMENT OF FACTS

The Tribe created the Commission to implement its Tribal Consumer Financial Services

Regulatory Ordinance ("Ordinance").[4]  The Commission consists of one tribal member, Mr.

David Tomas, who acts as the regulatory commissioner, assisted by two attorneys (one, a former

acting deputy director of enforcement at the Bureau; the other, a former United States Attorney

nominated by President Obama and unanimously confirmed by the United States Senate).  The

Commission independently regulates and controls the provision of Consumer Financial Services

within tribal jurisdiction.[5]

Any lender seeking to provide financial services within tribal jurisdiction must apply for a

license from the Commission.[6]  Each licensee must then comply with tribal and applicable

federal consumer-protection laws.[7]  The Commission has the power to regulate all lending

entities within its jurisdiction.[8]  The Commission conducts regular examinations of the Tribe's

lending operations and has the power to impose significant fines and revoke licenses.  The

---

[3] Count VI alleges that the Tribal Lenders violated the CFPA by violating TILA.

[4] ECF No. 18-3, §§ 1.1(m), 4.1.  The Court can take judicial notice of the Ordinance for the reasons set forth in the Tribal Lenders' memorandum.  ECF No. 62, p. 6 n.2.

[5] ECF No. 18-3, § 1.1(e)-(m).

[6] *Id.* § 5.

[7] *Id.* § 7.2.

[8] *Id.* § 4.

examinations of and orders from the Commission reflect best practices of a Bureau examination and a Department of Justice investigation.

The Tribal Lenders are all arms of the Tribe and headquartered on the Tribe's reservation.[9] They extend credit over the Internet.[10] All loan agreements entered into between the Tribal Lenders and any consumers clearly state that the loans are originated on tribal lands and governed by tribal law.[11]

## IV.   QUESTION PRESENTED

When Congress established the Bureau, it explicitly limited the Bureau's enforcement power to "Covered Persons," which did not include tribes or government-owned enterprises. Rather, the CFPA required the Bureau to coordinate with states and tribes alike as co-regulators. Finally, the CFPA explicitly prohibited the Bureau from establishing a federal usury limit.  Can the Bureau assert that it is an unfair or deceptive practice for a government-owned enterprise to originate and service loans through interstate commerce to residents of states with different usury limits and licensing requirements?

## V.   ARGUMENT

Despite that Congress specifically designated tribes and states as co-regulators, the Bureau has rejected the Commission's efforts to work collaboratively on consumer-protection issues.  This fails consumers and hurts tribes.  Rather than work constructively with the Commission to address issues of concern raised in this litigation, such as the TILA allegations, the Bureau rushed to file this lawsuit without consulting the very entity with jurisdiction over loan agreements governed by tribal law.

---

[9]  *See* Compl. ¶¶ 7, 10, 15, 21, 26.

[10] *Id.* ¶ 31.

[11] *Id.* ¶¶ 95-97.

The Bureau dislikes small-dollar loans—calling them "debt traps."[12] In contrast, offerors and customers say the loans provide vital access to capital and emergency funds.  Reasonable minds can differ on these points.  But this case is not about lending, it's about federal agency overreach.

Agency efforts to regulate a disfavored product must be statutorily authorized. The agency must comply with statutorily-mandated approaches, its legal basis must accord with other federal law, and the agency must reasonably consider how it might avoid unintended consequences.

The Commission fears that the Bureau has departed from sound governance by pursuing this matter and the Court should therefore dismiss the Bureau's complaint.  Furthermore, the Commission urges the Court to rest its decision on all three statutory issues presented here.  If the Bureau's overreach in all three areas is not addressed, the Bureau's approach will risk abrogating long-standing expectations about tribal self-determination, the sovereignty of tribes and states, freedom from federal usury limits, and everyone's right to contract for choice of law.

A.   **Congress Directed the Bureau to Protect Consumers by "Coordinating" with Co-Regulators like the Commission.**

1.   **The Commission actively regulates all lending entities within its jurisdiction.**

Every lender within the Tribe's jurisdiction—including the Tribal Lenders—is subject to licensing, regulation, and examination by the Commission.  The Tribe has enacted—and the Commission actively enforces—a lending code with detailed consumer protection requirements

---

[12] CFPB, CFPB Finalizes Rule To Stop Payday Debt Traps, *available at* https://www.consumerfinance.gov/about-us/newsroom/cfpb-finalizes-rule-stop-payday-debt-traps/ (last accessed Oct. 21, 2017).

that incorporate many aspects of federal consumer protection laws and in some cases exceed the consumer protections provided under federal law.[13]

For example, the Ordinance that governs the Tribal Lenders' lending operations imposes data security standards that exceed federal law.[14]  The Ordinance prohibits all misrepresentation, which sets a more stringent standard than the CFPA's authority to prevent "deception."[15]  The Tribe's law requires particular loan disclosures,[16] explicitly limits certain lending practices such as repeated rollovers, [17] and specifies the computation of interest rate refunds in the event of prepayment.[18]  The Commission examines and enforces both the applicable federal consumer-protection laws and the more stringent tribal lending laws.

The Commission examines the Tribal Lenders for compliance with all relevant enumerated consumers laws defined under the CFPA,[19] as well as laws outside the Bureau's authority, like the Gramm-Leach-Bliley privacy safeguards rule[20] and the Red Flags Rule.[21]  Those

---

[13] *See* ECF No. 18-3.  Although the Bureau implies otherwise, the fact that the Commission has not imposed a usury limit does not suggest that its regulations are somehow inadequate. States have widely varying usury limits, and some states, like the Tribe, have no usury limit. That is a policy decision that each sovereign is entitled to make, free from interference by the Bureau.

[14] *Id.* §§ 9.1-9.6.

[15] *Id.* § 7.3(c)(3) ("[A Licensee shall not] use or cause to be published or disseminated any advertisement that contains false, misleading or deceptive statements or representations."). Under CFPA § 1037 (12 U.S.C. § 5531) and Federal Trade Commission Act § 5 (15 U.S.C. § 45(a)(1)), a deception claim exists only if the misrepresentation is material.  FTC POLICY STATEMENT ON DECEPTION (October 14, 1983), appended to *FTC v. Cliffdale Associates, Inc.*, 103 F.T.C. 110, 174 (1984); *FTC v. Freecom Communs.*, 401 F.3d 1192, 1196 (10th Cir. 2005).

[16] ECF No. 18-3, § 8.2(h)(2).

[17] *Id.* § 9.

[18] *Id.* § 8.2(m)(2).

[19] 12 U.S.C. § 5481(12).

[20] 15 U.S.C. § 6801.

[21] 15 U.S.C. § 1681m(e), 1681w.

examinations include an on-site review of lending records, data privacy protocols, compliance procedures, call scripts, marketing materials, consumer complaints, review of financial documents, monitoring of contact with consumers, and interviews of key employees.

That on-site examination culminates in a report of examination that identifies any risks to consumers and violations of tribal or applicable federal consumer protection laws.  Issues discovered in the examination are addressed through "matters requiring attention" or required "corrective actions." The Commission has the enforcement authority under tribal law to revoke licenses, enjoin conduct, and assess civil money penalties.[22]  With the Tribe performing the functions necessary for regulatory oversight, the Bureau's involvement is intrusive, duplicative, and unnecessarily costly.

### 2. The Commission already addressed the issues raised in the Bureau's TILA claims.

In fact, the Commission has already addressed the TILA concerns the Bureau raised in Counts IV and V of its complaint.  Unfortunately, the Bureau appears to be unaware that the practice forming the basis of its allegations in Counts IV and V no longer occurs.

While conducting an on-site examination in April 2017, the Commission identified and addressed the APR-disclosure issues raised by the Bureau.  Following a dialogue between the Commission and the Tribal Lenders, the Tribal Lenders agreed to change their practice.  The Commission's investigation determined that consumers were not harmed by the practice because they received accurate information about the cost of the loans stated in nominal dollar terms,[23]

---

[22] ECF No. 18-3, §§ 10.2; 10.3(a).

[23] *See, e.g.*, Compl. ¶¶60, 61.

and consumers received printed APR disclosures in the loan documents.[24]  Thus, no monetary relief was warranted.

In sum, the Bureau's TILA concerns have already been addressed by the Commission.  The Bureau would know this—or have been able to object to the Commission's analysis—if it had only coordinated with the Commission as Congress directed.

### 3.     The Bureau has itself violated the CFPA Section 1015.

The Bureau's failure to coordinate with the Commission—and perhaps the instant lawsuit itself—violates the CFPA.  Section 1015 provides that the Bureau "shall coordinate" with "State regulators"[25]—which includes tribal regulators.  The Commission attempted to establish a regulatory relationship with the Bureau, but the Bureau refused the Commission's invitation to discuss the complementary missions. The Bureau filed this lawsuit instead.  By ignoring Congress's instruction to coordinate with co-regulators, the Bureau has itself violated the law.[26]

The Bureau should not be allowed to substitute itself as the regulatory authority for tribal lenders.  Doing so will deprive the Commission of its power to administer and enforce tribal law. Not only is this an attack upon the Tribe's sovereignty, it would replace an effective, efficient, and attentive regulator with a federal overseer that has no tribal connection.

---

[24] *See, e.g.*, Compl. ¶51 (excerpt from installment loan contract).

[25] 12 U.S.C. §5495. Coordination

The Bureau shall coordinate with the Commission, the Commodity Futures Trading Commission, the Federal Trade Commission, and other Federal agencies and State regulators, as appropriate, to promote consistent regulatory treatment of consumer financial and investment products and services.

[26] An order directing the Bureau to comply with the coordination provision at 12 U.S.C. § 5495 may be appropriate *sua sponte* relief.

### B.     The Bureau does not have the Authority to Maintain this Action.

#### 1.     The Tribe is a sovereign co-regulator, not a "Person" subject to the Bureau's enforcement authority.

The Bureau can only commence an action against or impose a civil penalty on a "Person."[27]  Thus, if the Tribe is not a "Person" under the terms of the CFPA, then the Bureau does not have the authority to maintain this action.

Under the CFPA, a "Person" is "an individual, partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity."[28]  By contrast, a "State" is "any State, territory, or possession of the United States . . . or any federally recognized Indian tribe."[29]

The CFPA's definition of "Person" does not encompass the Tribe.  The United States Supreme Court explained in *Vermont Agency of Natural Resources* that there is a "longstanding interpretive presumption that 'person' does not include the sovereign[.]"[30]  That same presumption applies to tribes.[31]  Nothing in the CFPA suggests that the term "Person" includes states or tribes.

Because Congress specifically included tribes—which act as co-regulators with the Bureau—in the definition of a "State," excluding tribes from the definition of "Person" is a plain-language interpretation of the CFPA.[32]  If Congress had intended to subject tribes to CFPB

---

[27] 12 U.S.C. § 5564(a), (c).

[28] 12 U.S.C. § 5481(19).

[29] 12 U.S.C. § 5481(27).

[30] *Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 781 (2000) (quoting *United States v. Cooper Corp.*, 312 U.S. 600, 604 (1941)).

[31] *Inyo Cnty. v. Paiute-Shoshone Indians of the Bishop Cmty. of Bishop Colony*, 538 U.S. 701, 709-12 (2003).

[32] *See* 12 U.S.C. § 5495 (instructing the CFPB to "coordinate with . . . State regulators").

regulation, it easily could have done so in equally plain language.[33]  Courts are obligated, of course, to read statutes harmoniously and in a manner that gives effect to all of a statute's provisions.[34]  By expressly incorporating tribes into the category of co-regulators, Congress excluded them from the category of entities that are regulated by the Bureau.[35]

Congress's exclusion of tribes from the Bureau's reach comports with the longstanding doctrine of tribal sovereignty.  Tribes possess "the common-law immunity from suit traditionally enjoyed by sovereign powers" as "a necessary corollary to Indian sovereignty and self-governance."[36]  That immunity bars suit against tribes unless a tribe waives its immunity or Congress specifically—and unequivocally—authorizes suit.[37]

The Supreme Court has also repeatedly emphasized that tribal immunity extends to commercial activities of a tribe, even when those activities take place off tribal land.[38]

---

[33] *See, e.g.*, Federal Debt Collection Procedures Act, 28 U.S.C. § 3002(10) (defining "person" as "a natural person (including an individual Indian), a corporation, a partnership, an unincorporated association, a trust, or an estate, or any other public or private entity, including a State or local government or an Indian tribe").

[34] *See, e.g.*, *Fish v. Kobach*, 840 F.3d 710, 736 (10th Cir. 2016) ("A court must therefore interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole." (internal quotations omitted)).

[35] *See* Gavin Clarkson et al., *Online Sovereignty: The Law and Economics of Tribal Electronic Commerce*, 19 Vand. J. Ent. & Tech. L. 1, 13 (Fall 2016) ("Congress's drafting of the Dodd-Frank Act reveals its intention to include tribes among the financial regulators and not the regulated."); *accord Meyers v. Oneida Tribe of Indians of Wis.*, 836 F.3d 818, 824 (7th Cir. 2016) (finding that the definition of "person" in the Fair and Accurate Credit Transaction Act does not include tribes).

[36] *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2030 (2014) (internal quotations omitted).

[37] *Id.* at 2030-31; *United States v. Wheeler*, 435 U. S. 313, 323 (1978) (unless and "until Congress acts, the tribes retain" their historic sovereign authority.)

[38] *Bay Mills*, 134 S. Ct. at 2031; *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.,* 523 U.S. 751, 756 (1998) (manufacturing); *Comm'n v. Citizen Band Potawatomi Tribe of Okla.*, 498 U.S. 505, 509 (1991) (selling cigarettes); *Puyallup Tribe, Inc. v. Dep't of Game of Wash.*, 433 U.S. 165,

Congress's decision in the CFPA to cast tribes as sovereign co-regulators recognizes the importance of tribal sovereignty—and certainly is not an "unequivocal" abrogation of tribal sovereign immunity.

Quite the opposite from an abrogation of sovereign immunity, co-regulation is a policy decision that promotes tribal self-determination and economic development. "A key goal of the Federal Government is to render Tribes more self-sufficient and better positioned to fund their own sovereign functions, rather than relying on Federal funding."[39]

Internet commerce is the Tribe's new lifeblood. Tribal communities, like Upper Lake, often are geographically isolated, lack basic infrastructure, and struggle with long-standing cycles of extreme poverty.[40] In response to those challenges, tribal leaders have begun to rely on electronic commerce to create economic development, raise revenue, and fund crucial government services.[41]

The instant matter is one of a series of actions to deprive tribes of the authority to license and regulate their own lending operations.[42] Allowing this matter to proceed has a number of consequences:

---

167–168, 172–173 (1977) (fishing); *United States v. United States Fidelity & Guaranty Co.*, 309 U.S. 506, 512 (1940) (leasing coal mines).

[39] *Bay Mills*, 134 S. Ct. at 2043 (Sotomayor, J., concurring).

[40] Clarkson, *supra* note 35, at 4-5.

[41] *Id.* at 17 ("Tribal government e-commerce initiatives do not just support basic, fundamental needs for tribal government operations and services. They also extend the opportunity for tribes to move beyond sheer subsistence and basic economic survival. Internet commerce gives tribal governments hope in their ability to depart from past struggles for survival to legitimate possibilities for continued economic growth, prosperity, and success.").

[42] *See* Consent Order, *In re Zero Parallel, Inc.*, 2017-CFPB-0017 (Sept. 6, 2017); *CFPB v. Great Plains Lending, LLC*, Case No. CV-14-2090, Doc. 28, (filed May 27, 2014) (D.C. C. Cal. 2014), *aff'd, CFPB v. Great Plains Lending, LLC*, No. 14-55900 (9th Cir. 2017).

- Acknowledging Bureau jurisdiction over the Tribal Lenders will displace tribal law and tribal financial regulators, in contempt of decades of policy;

- Continuing this suit will treat a government-owned economic enterprise—which funds government operations for the benefit of tribal members—just like a privately-owned for-profit corporation;

- Giving the Bureau the authority it asserts in this case will deprive tribes of their ability to create and drive economic development; and

- Permitting the Bureau's action in this matter will engender a fundamental disrespect for tribes as sovereigns that will threaten confidence in tribal law and reduce the ability of tribes to self-govern in all aspects of commerce.[43]

## 2.    No precedent supports this action.

Only two cases have touched upon issues related to this action, neither of which is either applicable or controlling.  The Ninth Circuit, in *CFPB v. Great Plains,*[44] recently held that the CFPA was a law of general applicability, and thus allowed the Bureau to pursue an investigation through a Civil Investigative Demand ("CID").  That ruling is inapposite. When courts evaluate challenges to an agency's investigative powers, the courts generally enforce a CID as long as "there is some plausible ground for jurisdiction, or to phrase it another way, unless jurisdiction is

---

[43] *See* Clarkson, *supra* note 35, at 9 ("With over one-quarter of American Indians living in poverty – nearly twice the national average – it has never been more important to promote confidence in the Indian economy.  When courts do not give full force and effect to contracting parties' desires to resolve their private disputes using tribal courts and tribal law, this confidence is threatened."); *id.* at 27 ("To allow application of another sovereign's law to [tribal lending agreements] – which directly implicate the economic well-being of the tribe – is not only counterproductive but is contrary to nearly two centuries of Supreme Court jurisprudence. . . . Implicit in this attempted regulation is a fundamental disrespect for tribes.").

[44] *See Consumer Financial Protection Bureau v. Great Plains Lending, LLC*, 846 F.3d 1049 (9th Cir. 2017), *petition for cert. filed*, (No. 17-184) (August 2017).

plainly lacking."[45]  This approach permits an agency to investigate whether it has the authority to enforce its statutes.

That's not the case here.  A CID is not at issue.  Unlike CIDs, the Bureau must have jurisdiction to bring an enforcement action in district court.  In this case, it doesn't.  The CFPA limits the Bureau's jurisdiction to "covered persons," or service providers to covered persons which, for the reasons discussed above, does not include Tribes or states.[46]

More fundamentally, the Ninth Circuit's *Great Plains* decision is contradicted by the Supreme Court's approach to statutory interpretation in *Stevens* and *Inyo County*. As those cases make clear, the proper analytical framework is whether the term "person" includes a sovereign, not whether the law is one of general applicability.[47]  In contrast, the *Great Plains* court upheld the Bureau's CID by following the framework it announced in *Donovan v. Coeur d'Alene Tribal Farm*.[48]  Importantly, the Tenth Circuit has rejected the Ninth Circuit's *Coeur d'Alene* framework, holding that even laws of general applicability do not apply to tribes acting in their sovereign capacity.[49]  This Court, of course, is bound to follow the law of the Tenth Circuit.

---

[45] *EEOC v. Karuk Tribe Hous. Auth.*, 260 F.3d 1071, 1077 (9th Cir. 2001) (quotations omitted); *accord EEOC v. Randstad*, 685 F.3d 433, 442 (4th Cir. 2012).

[46] 12 U.S.C. § 5531. ("The Bureau may take any action authorized under part E to prevent a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service.")

[47] *See Stevens*, 529 U.S. at 780; *Inyo Cnty.*, 538 U.S. at 709-12.

[48] 751 F.2d 1113, 1116 (9th Cir. 1985).

[49] *NLRB v. Pueblo of San Juan*, 276 F.3d 1186, 1199 (10th Cir. 2002) (en banc) (distinguishing between a Tribe's sovereign capacity and its proprietary capacity); *see also Soaring Eagle Casino & Resort v. NLRB*, 791 F.3d 648, 661-67 (6th Cir. 2015) (exploring why the *Coeur d'Alene* framework is inconsistent with Supreme Court precedent and laying out the proper analysis); 791 F.3d at 672-73 (discussing the circuit split and noting that the Tenth Circuit "rejected the *Coeur d'Alene* framework").

The Tenth Circuit's interpretation is well-reasoned and accords with the original source of the *Coeur d'Alene* framework: *Federal Power Commission v. Tuscarora Indian Nation*.[50]  In dictum, the *Tuscarora* court simply noted that "a general statute in terms applying to all persons includes Indians and their property interests."[51]  As the Tenth Circuit has recognized, that single sentence in *Tuscarora* is insufficient to support such a sweeping revision of the longstanding principles of tribal sovereignty as the Ninth Circuit has done.[52]  That revision is especially inappropriate where, as here, the CFPA recognized that Tribes act in their sovereign capacity as co-regulators.[53]

Likewise, the Central District of California's decision in *CFPB v. CashCall, Inc.*[54] does not apply to this case.  Although Western Sky Financial, the lender in *CashCall*, was licensed to do business by the tribal regulatory authority, the tribe did not own Western Sky, nor was Western Sky a service provider to the tribe.[55]  Moreover, Western Sky sold the loans at issue to "CashCall, Inc.," a non-tribal entity that had no nexus to an American Indian tribe.[56]

The threshold question for this Court is whether the Tribe is a "Person" subject to the Bureau's enforcement authority.  As the CFPA and Supreme Court precedent make clear, the

---

[50] 362 U.S. 99 (1960) *see also Coeur d'Alene*, 751 F.2d at 1115 (tracing its decision back to *Tuscarora*).

[51] *Id.* at 116.

[52] *See Pueblo of San Juan*, 276 F.3d at 1194-1200.

[53] Even if it is not clear from the text of the statute that tribes are sovereign actors under the CFPA, vague laws are narrowly interpreted in favor of tribes.  *Cty. of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 269 (1992); *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 767-68 (1985).

[54] Civ. No. 15-7522-JFW (RAOx), 2016 U.S. Dist. LEXIS 130584 (C.D. Cal. Aug. 31, 2016).

[55] *Id.* at *5 (stating that Western Sky was owned by Martin Webb, a tribal member).

[56] *Id.* at *6-7.

Tribe is not a "Person."  Thus, the Bureau may not bring a civil action against the Tribe—a sovereign co-regulator.[57]

### 3. The CFPA prohibits the Bureau from enforcing state law or setting usury limits.  The Bureau would have this Court read those express limitations out of the CFPA.

The Bureau's complaint fails for two reasons independent of whether it can exercise enforcement jurisdiction over the Tribe: the CFPA does not give the Bureau the power to enforce state law and it forbids the Bureau from creating a national usury law.  By this lawsuit, the Bureau is trying to circumvent those two statutory limits.

### a. The CFPA prohibits the Bureau from establishing usury limits.

Congress specifically prohibited the Bureau from establishing a limit on interest rates.[58] The Bureau's allegations related to seven states rely on state usury law.  The Bureau asserts that the Tribal Lenders violated the CFPA's prohibition against unfair, deceptive, or abusive acts and practices by collecting loan principal and interest in states where the loans are "void" or "voidable" under state law because the interest rates exceed seven different state usury caps.[59] The relief requested by the Bureau would create a *de facto* national usury limit, measured by the

---

[57] The Commission notes that the Bureau's authority to prevent unfair, deceptive, or abusive practices extends to service providers, but only service providers that "provide[] a material service to a covered person."  12 U.S.C. § 5481(26)(A).  The Bureau alleges that the Tribal Lenders are companies that are "owned and incorporated by [the Tribe]."  Compl. ¶ 7.  Therefore, hypothetically, even if some aspect of the Tribal Lenders' business was conducted by non-tribal entities (which it is not), these service providers also would be outside the Bureau's authority because they are not service providers to covered persons.  *See* 12 U.S.C. § 5531.  No factual inquiry is necessary to determine whether or not the Tribal Lenders are "arms of the Tribe" in order to dismiss this case on the pleadings.

[58] 12 U.S.C. § 5517(o) ("No provision of this title shall be construed as conferring authority on the Bureau to establish a usury limit[.]").

[59] Compl. ¶¶ 116, 117.

most restrictive state standard.  The Court should not grant the Bureau powers that Congress expressly withheld.

### b.    The Bureau may only enforce federal law.

Far from creating a uniform national law or consolidating all authority for financial regulation in the Bureau, the CFPA promotes state enforcement of state law.[60]  Congress specifically limited the Bureau's authority by permitting it to enforce only federal law, not state law.[61]

In addition to a lack of statutory authority, the Bureau's enforcement of state usury and licensing laws in this case would impermissibly impose the law of one sovereign on another. The Bureau's position would effectively displace tribal lending and licensure laws and substitute the laws of at least seventeen different states on a consumer-by-consumer basis.  According to the Bureau, if a consumer entered into a loan agreement in New Hampshire governed by New Hampshire law, where the interest rate is capped at 36%, and then moved to Arkansas, where the interest rate is capped at 17%,[62] any continued collection of the loan would violate federal law. Thus, the policy decision of one sovereign, New Hampshire, would be abrogated by the policy decision of another sovereign, despite the fact that New Hampshire law governed the loan agreement.  That outcome is inconsistent with the CFPA's emphasis on the importance of State (including tribal) law, enforcement, and sovereignty.

---

[60] Clarkson, *supra* note 35, at 14 ("[The CFPA] promotes enforcement of state consumer protection laws and state power to directly enforce state and federal law.").

[61] 12 U.S.C. § 5531(a) (limiting the CFPB's enforcement authority to violations of "Federal law"); 12 U.S.C. § 5536(a)(1)(A) (making it unlawful to provide a financial product or service "not in conformity with Federal consumer financial law").

[62] The referenced interest rates are taken from Compl. ¶ 116.

Even more explicitly, the Bureau alleges that lenders who are properly licensed under tribal law violate federal law when they try to collect on loans in states in which they are not licensed. As a practical matter, lenders, whether licensed by state or tribal authorities, will no longer be able to transact business outside the jurisdiction in which they are licensed.  Congress recognized the undesirability of this restriction on commerce when it enacted the National Bank Act in 1864.[63]

The National Bank Act allows banks to charge customers the interest rate allowed by the law of the state where the bank is located, regardless of where the consumer is located.[64] Importantly, this holds true even if consumers use some means of interstate commerce and never actually set foot in the bank's home state.[65]

The home-state approach has sound rationale. In *Marquette National Bank*, the Supreme Court recognized the importance of predictability in bank transactions:

> If the location of the bank were to depend on the whereabouts of each credit card transaction, the meaning of the term "located" would be so stretched as to throw into confusion the complex system of modern interstate banking. . . .  We do not choose to invite these difficulties by rendering so elastic the term "located."[66]

The Bureau's theory here would conjure up precisely the confusion the Supreme Court feared in *Marquette National Bank*.  As in the example of the consumer who moves from New Hampshire to Arkansas, the enforceability of a loan would change depending on the location of the

---

[63] *Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 314-15 (1978) ("Close examination of the National Bank Act of 1864, its legislative history, and its historical context makes clear that . . . Congress intended to facilitate . . . a 'national banking system.').

[64] 12 U.S.C. § 85; *see also id.* at 301 (allowing a Nebraska bank to charge its Minnesota credit card customers interest greater than that allowed under Minnesota law because the bank was located in Nebraska, which permitted the higher rate).

[65] *Marquette Nat'l Bank*, 439 U.S. at 311.

[66] *Id.* at 312.

consumer at any moment in time.  In addition, a lender who had complied with every state and

federal law could suddenly become subject to liability simply because a consumer moved to a

different state.  That result is absurd and impractical.

 If the Bureau's theory isn't rejected here, it could expand the Bureau's authority far

beyond what Congress intended in the CFPA in a manner inconsistent with the long-established

policies enshrined in the National Bank Act.

### C.     The Bureau's Interpretations Lack Limiting Principles.

The Bureau's UDAAP interpretation has no limiting principles that prevent the Bureau

from expanding its jurisdiction to regulate financial services offered by other governments in the

United States.  It might also make illegal interstate lending that the National Bank Act and

implementing regulations clearly permit.

#### 1.     If tribally-owned entities are "Covered Persons," so are other government-owned businesses.

The Bureau has argued that "persons" within its scope of authority includes any

"company" or "other entity," even if they are government-owned.[67]  If the Bureau has

enforcement jurisdiction over tribes, it will be able to assert the same jurisdiction over state

entities.[68]  Established state-run financial services such as student loan programs, homeowners

assistance programs, and state-owned credit unions would be subject to Bureau oversight.

---

[67] Decision and Order on Petition to Modify, *In Re Great Plains Lending, LLC; Mobiloans, LLC; and Plain Green, LLC*, 2013-MISC-Great Plains Lending-0001 (Sept. 26, 2013).

[68] Br. for Amici Curiae States of Oklahoma, Indiana, and Nevada, *Great Plains Lending, LLC v. CFPB*, No. 17-184 (Sept. 5, 2017) ("If [the CFPB's position] is correct, States operate a number of agencies that the CFPB may now regulate, investigate, and coerce in the same was the CFPB is investigating Petitioners as arms of Indian tribes.").  Although state sovereignty is not co-extensive with tribal sovereignty, see, e.g., *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 165 (1980) (Brennan, J., concurring in part and dissenting in

Indeed, under the Bureau's interpretation that it has authority over any "company" or "other entity" engaged in consumer finance, federal programs would also fall under the Bureau's jurisdiction. Allowing any "company" or "entity" to be a covered person under the CFPA would extend the Bureau's regulatory reach to such federally-owned organizations as the Government National Mortgage Association (Ginnie Mae)—a wholly-owned government corporation within the Department of Housing and Urban Development—or the Neighborhood Reinvestment Corporation (dba Neighborworks America)—a federally-owned non-profit run by a board of directors comprised of leaders from select federal agencies like the Federal Reserve Board and the National Credit Union Administration.

Congress could not possibly have meant to grant the Bureau the authority to supervise financial service providers owned by governments. The Bureau's interpretation of its authority lacks inherent limits that would prevent this irrational result.

### 2.    The Bureau's theory could extend to clearly lawful interstate lending

In addition, the Bureau's theory that lending into states with usury limits or licensing restrictions is unfair, deceptive, or abusive cannot be reconciled with other federal law.[69] National banks and thrifts routinely market, originate, and collect on loans that exceed certain states' usury rates, particularly when issuing credit cards.  Consumers in states with usury limits routinely apply for and use these products, knowing that the interest rates exceed what is offered

---

part), the CFPA treats states and tribes identically.  *See* 12 U.S.C. 5481(27); discussion *supra* section V.B.1.

[69] National Bank Act, 12 U.S.C. § 81, *et. seq.;* Depository Institutions Deregulation and Monetary Control Act of 1980, Public Law 96-221, 94 Stat. 161; 12 C.F.R. § 190.3 ("(a) The provisions of the constitution or law of any state expressly limiting the rate or amount of interest, discount points, finance charges, or other charges which may be charged, taken, received, or reserved shall not apply to any Federally-related loan.")

from local lenders.  Like federally-chartered banks, tribally-licensed lenders rely on their locus to determine usury limits and make this choice of law an explicit contract term.  And like federally-chartered banks, tribally-owned lenders rely on contractual choice-of-law provisions to establish the law governing the parties' lending agreement.

The Bureau has not plead any facts to support its claim that consumers understand online loan contracts any less than credit card contracts.  If the Bureau's theory is accepted, the Bureau will transform a standard industry practice authorized by the National Bank Act into a violation of federal law.

### 3.    Contractual Choice of Law Is Critical to Commerce.

The confusion created by the Bureau's position would upend consumer and business expectations.  Both consumers and businesses depend on the ability to choose the law that governs their agreements free from undue interference.[70]  When consumers enter into a loan agreement with the Tribal Lenders, both the Tribal Lenders and the consumers can rely on the application of tribal law and regulation by the Commission.[71]  If the Bureau is permitted to displace the concept of contractual choice-of-law, consumers and lenders will no longer enjoy the freedom to contract that is available in virtually every other lending relationship.  The Bureau's theory underlying this lawsuit has no limiting principles that would prevent this outcome.

---

[70] Clarkson, *supra* note 35, at 27 (noting that consumers and tribal lenders expressly chose to use tribal law and that preventing the application of tribal law "prevents consumers from accessing products they desire and exemplifies the 'nanny state' at its worst" and "potentially leav[es] many consumers with no ability to borrow whatsoever").

[71] Compl. ¶¶ 95-96.

In the Tenth Circuit, when a court interprets a contract, as a general matter it applies the law that the parties selected in their contract.[72]  The circuit in *Boyd Rosene & Associates. v. Kansas Municipal Gas Agency,*[73] explained that absent special circumstances, courts will honor the parties' choice of law in contracts:

> Because conflicts of law are inevitable in a federal system, parties to a contract are empowered to and frequently do choose a particular state's law to apply to the execution and interpretation of the contract. Absent special circumstances, courts usually honor the parties' choice of law because two "prime objectives" of contract law are "to protect the justified expectations of the parties and to make it possible for them to foretell with accuracy what will be their rights and liabilities under the contract."[74]

The loans originated on tribal land.  The tribal lending entities are domiciled on tribal land. And the Tribe's lending regulatory commission supervises the lending operations.  Indeed, because the tribal lending code, in some cases, provides greater consumer protections than federal law, the Tribe has a greater interest than any state in imposing its lending laws on contracts originated by its government-owned enterprises.[75]

---

[72] *See* Restatement (Second) of Conflict of Laws § 187 (hereinafter Restatement); *id.* cmt. e (1971) ("[T]he demands of certainty, predictability, and convenience dictate that, subject to some limitations, the parties shall have power to choose the applicable law.").

[73] 174 F.3d 1115, 1121 (10th Cir.1999); *cited with approval by Yavuz v. 61 MM, Ltd.*, 465 F.3d 418, 427–28 (10th Cir. 2006).

[74] *Id.* (citing Restatement § 187 cmt. e).

[75] Moreover, this Court would also find tribal law applicable if it used ordinary conflict of laws principles. When the question raised by the contractual dispute goes to the substance of the obligation, Kansas courts apply the primary rule contained in Restatement 332, *lex loci contractus*, which calls for the application of the law of the state where the contract is made. *Moses v. Halstead*, 581 F.3d 1248, 1252 (10th Cir. 2009) (citing *Layne Christensen Co. v. Zurich Canada*, 30 Kan.App.2d 128, 38 P.3d 757, 766–67 (2002)); Restatement (First) of Conflicts of Law § 358, cmt. b (1934); *cf. In re K.M.H.*, 285 Kan. 53, 169 P.3d 1025, 1031–32 (2007) ("[T]o the extent this case is viewed as a contractual dispute, Kansas courts apply the Restatement (First) of Conflict of Laws § 332 (1934), and the doctrine of lex loci contractus, i.e., the law of the state where the contract is made governs.").

The CFPA does not give the Bureau the power to impose shifting, extra-jurisdictional state usury limits on consumer loans.  And it certainly cannot displace the parties' autonomy to select the choice of law merely because it prefers the laws of other jurisdictions.  This Court should prevent the Bureau from seizing that power.

## VI.   CONCLUSION

In bringing this case, the Bureau has ignored the CFPA's requirement that it "shall coordinate" with co-regulators of financial services, like the Commission. The Bureau does not have the authority to bring this suit against a governmental unit that is not a "covered person." The Bureau is expressly prohibited from setting usury limits and it cannot enforce state law; it should not be allowed to circumvent congressional directives with creative misuse of its UDAAP authority.

Congress's limitations on the Bureau are supported by sound legal, historic, and economic rationale.  In this matter, the Bureau has stepped far outside its delineated authority. Therefore, the Commission respectfully requests that this Court dismiss the Bureau's complaint, which was filed against entities that are properly under the Commission's jurisdiction.

Dated:  October 31, 2017                    Respectfully submitted,

                                            POLSINELLI PC


                                            By:/s/ Barry R. Grissom_____
                                                BARRY R. GRISSOM (#10866)
                                                900 W. 48th Place, Suite 900
                                                Kansas City, MO  64112-1895
                                                816-753-1000
                                                Fax:  816-753-1536
                                                bgrissom@polsinelli.com

                                                BRENDAN V. JOHNSON (*pro hac*)
                                                TIMOTHY W. BILLION (*pro hac*)
                                                Robins Kaplan LLP
                                                101 South Main Avenue, Suite 100
                                                Sioux Falls, SD  57104
                                                605-335-1300
                                                BJohnson@RobinsKaplan.com
                                                TBillion@RobinsKaplan.com

                                                SARAH J. AUCHTERLONIE (*pro hac*)
                                                Carlton Fields PC
                                                1025 Thomas Jefferson Street, NW
                                                Suite 400 East
                                                Washington DC  20007-5208
                                                202-965-8100
                                                Fax:  202-965-8104
                                                sja@carltonfields.com

                                            ATTORNEYS FOR HABEMATOLEL POMO
                                            OF UPPER LAKE CONSUMER FINANCIAL
                                            SERVICES REGULATORY COMMISSION

## <u>CERTIFICATE OF SERVICE</u>

       The undersigned hereby certifies that a true and correct copy of the above and foregoing pleading was served by (____) United States Mail, postage prepaid; (__x__) ECF Notification System; (____) E-mail; (____) Federal Express; and/or (____) Hand Delivery this 31st day of October, 2017, to:

Stephen Jacques, Esq.
Gabriel Sean Harris Hopkins, Esq.
Vanessa Anne Buchko, Esq.
Consumer Financial Protection Bureau
1700 G Street NW
Washington DC  20552
202-435-7000
Stephen.jacques@cfpb.gov
Gabriel.hopkins@cfpb.gov
Vanessa.buchko@cfpb.gov
ATTORNEYS FOR PLAINTIFF

Paul Croker, Esq.
Armstrong Teasdale LLP
2345 Grand Boulevard, Suite 1500
Kansas City, MO  64108-2617
816-221-3420
Fax:  816-221-0786
pcroker@armstrongteasdale.com

Beth A. Wilkinson, Esq.
Brant W. Bishop, Esq.
Lori Alvino McGill, Esq.
Rakesh Kilaru, Esq.
Wilkinson Walsh + Eskovitz, LLP
2001 M. Street NW, 10th Floor
Washington DC  20036
202-847-4035
Fax:  202-847-4005
bwilkinson@wilkinsonwalsh.com
bbishop@wilkinsonwalsh.com
lalvinomcgill@wilkinsonwalsh.com
rkilaru@wilkinsonwalsh.com
ATTORNEYS FOR DEFENDANTS

Nathaniel A. Dulle, Esq.
Wallace Saunders
10111 W. 87th Street
Overland Park, KS  66212
913-888-1000
Fax:  913-888-1065
ndulle@wallacesaunders.com
ATTORNEYS FOR NATIVE AMERICAN
FINANCIAL SERVICES ASSOCIATION

/s/ Barry R. Grissom